IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| In re: ) | |
| ) | CHAPTER 11 |
| **FAIRFIELD TIC, LLC** ) | |
| ) | CASE NO. 18-73744-VJ |
| **Debtor.** ) | |

**CORRECTED MEMORANDUM OPINION**

This matter comes before the Court on the motion of U.S. Bank National Association, as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2007-C7, Commercial Mortgage Pass-Through Certificates, Series 2007-C7, (the "Noteholder") a secured creditor of Fairfield TIC, LLC (the "Debtor"), in which Susan E. Collins (the "Receiver"), a court-appointed Receiver for the property in question, has joined. Specifically, the Movants seek an Order from this Court dismissing the Debtor's case pursuant to Section 1112(b) of the Bankruptcy Code for "cause." (Noteholder's Mot. to Dismiss, ECF No. 15; Receiver's Joinder, ECF No. 39.) Alternatively, the Noteholder seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d). The Court held a trial on these matters on November 20, 2018, and has reviewed all submitted briefs.[1]

**FINDINGS OF FACT**

The Debtor is a Delaware limited liability company ("LLC") formed for the purpose of investing in real estate. At this time, its sole asset is a 66.2296% tenant-in-common interest in the Fairfield Shopping Center located in Virginia Beach, Virginia (the "Shopping Center" or the

---

[1] The Court's ruling complies with the time frames set forth in 11 U.S.C. § 1112(b)(3), which provides that "[t]he court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph."

"Property"). The remaining interest is held by three other similar entities who, as of yet, have not filed bankruptcy.[2] The four tenants in common ("TICs") and their TIC Agreement were created to take advantage of the "like-kind exchange" provisions of the Tax Code. *See* 26 U.S.C. § 1031. In accordance with those provisions, the TIC Agreement places certain limitations on the TICs' ownership rights, including the requirement that any action to sell, manage, or lease the property shall be by unanimous consent of all the TICs. (Movant's Ex. 1, ECF No. 51 at 3–4.)

The four TICs purchased the Property in 2004 for approximately $22.5 million, funded by investments from the TICs themselves and an approximately $19 million loan from G.E. Capital Corporation. In 2007, appraisals placed the value of the Property at nearly $38 million and, based on that valuation, the TICs refinanced the G.E. loan through another loan of $30 million from Lehman Brothers. Through a series of assignments, the Noteholder acquired the Lehman Brothers Note. The parties have stipulated the Shopping Center has, at present, a value of no more than $27 million. (Joint Stipulation, ECF No. 75, at ¶5.) Although the Lehman Brothers refinance provided ten years for the TICs to develop an exit strategy or pay off the balance of the loan, the Note matured in October 2017 and the obligation remains payable and due in full with approximately $30 million outstanding in principal, interest, and fees.

Based on the briefs and testimony at the November 20, 2018 trial, it appears the TICs' exit strategy prior to maturity was to have Wheeler Real Estate Investment Trust, Inc. (the "REIT") acquire the Property. At that time, Jon Wheeler, who controls both the Debtor and BCP TIC, LLC ("BCP"), served as Chairman and Chief Executive Officer of the REIT. Two of Mr.

---

[2] The remaining 33.7704% interests are held by GCK TIC, LLC (20.4193%), DMF TIC, LLC (9.4243%), and BCP TIC, LLC (3.9268%). (Joint Stipulation, ECF No. 75, at 2.) The fee simple ownership of the underlying real estate is so allocated.

Wheeler's other real estate companies provided property and asset management for the Property and, in similar situations, the REIT had previously acquired commercial properties managed by Mr. Wheeler's management companies. In 2017, however, Mr. Wheeler lost control of the REIT and was ousted from his positions within the organization. The REIT then decided not to acquire the Property, leaving the TICs without an exit strategy for their soon-to-mature $30 million loan. Mr. Wheeler and his fellow investors through the four TICs attempted to negotiate an extension on the loan and worked with different investment companies and potential buyers to attempt to sell or refinance the Property; however, on the date of the trial approximately thirteen months after the loan matured, the Debtor had yet to develop any concrete exit strategy.

Meanwhile, on February 15, 2018, the Noteholder filed a complaint in the Circuit Court of Virginia Beach, Virginia, requesting the appointment of a receiver to manage the Property. On March 15, 2018, the state court appointed Susan E. Collins as receiver, who remains in control of the Property.

Shortly after appointment of the Receiver, Nikki Providence Road, LLC ("Nikki Providence Road") filed a lawsuit against the TICs stemming from a 2015 agreement to sell an outparcel portion of the Property. That litigation is stayed as a result of the Debtor's bankruptcy case.

The Noteholder set a foreclosure sale of the Property for July 2018. Upon notice of the sale, the evidence reflects the four TICs discussed the merits of filing Chapter 11 to stop the sale and protect their interests in the Property, but the Noteholder cancelled the sale before any of the TICs filed a bankruptcy petition. The Noteholder negotiated and executed a Deed in Lieu of Foreclosure Agreement with one of the TICs, GCK TIC, LLC ("GCK"). (Debtor's Ex. J, ECF No. 76-10, at 4.) The Noteholder then scheduled another foreclosure sale for October 29, 2018.

The Debtor filed its Chapter 11 petition on October 23, 2018, without companion cases filed by the other three TICs, and the Noteholder and Receiver have moved to dismiss the case under 11 U.S.C. § 1112(b) for cause, alleging that the Debtor did not file its petition in good faith. Alternatively, the Noteholder seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d).

## **CONCLUSIONS OF LAW**

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a), the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984, and the Order of Designation from the Fourth Circuit dated October 29, 2018. This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (G), and (O).

### I.     Dismissal Under 11 U.S.C. § 1112(b)

The Noteholder and Receiver first seek dismissal under 11 U.S.C. § 1112(b), which states that the court "shall convert a case under this chapter to a case under Chapter 7 or dismiss a case under this chapter . . . for cause." Section 1112(b)(4) provides an enumerated list of acts or omissions that amount to cause for dismissal; however, courts have interpreted this provision to be non-exclusive. *See, e.g.*, *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989); *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986).

Relevant to this case, in *Carolin Corp. v. Miller*, the Fourth Circuit adopted the view that Chapter 11 implicitly requires any debtor to file their petition in good faith, thus recognizing that a "bad faith" filing under Chapter 11 would also amount to cause for dismissal. 886 F.2d at 700. The Fourth Circuit noted that dismissal was proper in these cases only when the debtor acted in both objective and subjective bad faith. *Id.* at 700–01. The debtor must not have any objectively

reasonable possibility of reorganization, and the filing must have been with the intent to "abuse the reorganization process" or "to cause hardship or to delay creditors . . . without an intent or ability to reorganize." *Id.* at 702. Further, "[t]hough separate inquiries into each are required, proof inevitably will overlap. Evidence of subjective bad faith in filing may tend to prove objective futility, and vice versa." *Id.* at 701.

In adopting this two-pronged approach, the Fourth Circuit declined to identify any specific necessary factors, instead acknowledging that courts should consider the "totality of circumstances" in each case. *Id.* Nonetheless, the Fourth Circuit recognized that courts have identified certain conduct that often indicates bad faith or objective futility. For example, in *In re Little Creek Development Co.*, the Fifth Circuit noted several factors that often point to a lack of good faith:

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court.

779 F.2d at 1073.

The Noteholder asserts that the Debtor's situation closely resembles that in *In re Castleton Associates, Limited Partnership*, 109 B.R. 347 (Bankr. S.D. Ind. 1989). In *Castleton*, the debtor's only asset was an apartment complex managed by an independent contractor. The debtor received income only through profits from the complex after the management company paid all fees and costs for maintaining the property. The court stated that "[t]he Debtor itself really has no business; rather, it has contracted out to [the management company] the everyday

5

duties of maintaining and managing the apartments. So, the Debtor's business is to 'keep tabs' on the investments . . . while [the management company] does the actual managing, hiring and firing." *Id.* at 350. Additionally, the court noted that the debtor did not maintain employees, instead leaving that to the management company. Applying the *Little Creek* factors, the court ultimately dismissed the case finding that it was "not within the 'aims and objectives of bankruptcy philosophy,'" but rather "an attempt to soften the blow of bad business judgment." *Id.* at 351.

Other courts have engaged in similar analyses while applying the *Carolin* rule. *See, e.g.*, *In re Kinard*, No. C/A 01-03621-W, 2001 WL 1806039, at *6–7 (Bankr. D.S.C. Nov. 16, 2001) (applying *Carolin* to determine whether bad faith existed sufficient to grant relief from the automatic stay); *In re AMA Corp.*, 175 B.R. 894, 897 (Bankr. W.D. Va. 1995). For example, in *Kinard*, the court found objective futility where the debtor had no significant assets other than the collateral at issue, no source of income, no equity in the property, no positive cash flow, and no going concern value. *Kinard*, 2001 WL 1806039, at *6. The court further found subjective bad faith where the reorganization involved what was essentially a two-party dispute, there were an insignificant number of unsecured creditors, the debtor had only one asset which was encumbered by the secured creditors' liens, the debtor had engaged in wrongdoing, the timing of the bankruptcy filing indicated an intent to delay or hinder creditors' collection efforts, and the bankruptcy provided the only possibility of avoiding foreclosure. *Id.* at *6–7.

### A. *Objective Futility*

Applying the factors from *Little Creek* and *Kinard* to the present case, the objective futility prong of the *Carolin* test is satisfied. Similar to those cases, this case involves a single-asset debtor with a 66% interest in real property that is fully encumbered by the Noteholder's

lien. The Debtor has limited access to the revenues of the Shopping Center, and the investment nature of the ownership interest shows there is no going concern to protect. Furthermore, the Debtor cannot propose a valid plan of reorganization without the support of its fellow TICs, who have chosen not to follow the Debtor into bankruptcy.

It is uncontested that this is a single-asset case[3] and that the Debtor has no equity in the Property. The Debtor has no assets except a 66% interest in the Property. Further, the Noteholder has a lien on the Property valued at $27 million, which partially secures an outstanding debt of approximately $30 million. Thus, even if the Debtor had a 100% interest in the Property, it would be fully encumbered. Instead, the Debtor holds merely a 66% interest, but remains jointly and severally liable on the obligation, leaving no equity in the Debtor's sole asset.

The Noteholder argues that the Debtor also has no income or cash flow and is essentially a passive investor like the debtor in *Castleton*, such that it cannot generate additional income to distribute to creditors. The Court agrees with this assertion. Because the TICs structured their investment subject to Section 1031 of the Internal Revenue Code, the Debtor may receive only its 66% share of net profits quarterly after all expenses have been paid. (Movant's Ex. 1, ECF No. 51 at ¶ 2.1.) Pursuant to the loan documents, however, the Debtor assigned its right to collect net proceeds from rents to the Noteholder in the case of default. (Movant's Ex. 3, ECF No. 53 at 8.) Thus, the Debtor may collect proceeds only if there is no default on the underlying obligation to the Noteholder, yet the Debtor defaulted on the obligation when the Note matured in October 2017. This obstacle is often dealt with in a variety of manners, including through a

---

[3] The Debtor's response to the motion to dismiss indicated that it may not agree with the Noteholder's characterization of this case as a single-asset case; however, in the same response, the Debtor appears to concede that the single-asset rules of the Bankruptcy Code would apply. Additionally, counsel for the Debtor stated at trial that this is, in fact, a single-asset case.

grant of adequate protection under a cash collateral order, but this typically occurs when there is a single owner of the property. *See, e.g.*, *In re Brandon Assocs.*, 128 B.R. 729 (Bankr. W.D. Va. 1991). In this case, the Property is also currently under the control of the Receiver, which further limits the Debtor's access to the proceeds. Accordingly, the Debtor has no right to distributions, leaving it with no current cash flow from the Property. Importantly, Laura Nguyen, a colleague of Mr. Wheeler testifying in support of the Debtor's restructuring, stated that the Debtor needed access to all of the Shopping Center's cash flow to reorganize, not just its proportionate distributive share under the TIC Agreement.[4] The record does not indicate that the Debtor has any other means by which it could receive regular income.

The Debtor attempts to avoid its characterization as a passive investor, noting that the TIC Agreement allows for the TICs to select a management company and participate in sale and lease decisions. According to testimony at trial, however, the Debtor's management role appears to have been limited to signing off on lease agreements or responding to notices of management or leasing changes sent on behalf of the Property's management company to the TICs. This is far from the active role that the property and asset management companies take in day-to-day operations of managing a shopping center. Rather, similar to *Castleton*, the TICs have contracted out the everyday maintenance and management duties of the Property and reserved merely final approval power over such decisions. Moreover, at present, management decisions are made not by the TICs, but by the Receiver pursuant to the state court's order. (Movant's Ex. 9, ECF No. 59 at 4–5.) Ultimately, the fact that the TIC Agreement provided a mechanism for the TICs to sell, manage, or lease the Property does not mean that the Debtor in this case actually

---

[4] Even if the Debtor had a right to distributions under the terms of the TIC Agreement, the testimony at trial indicated that the TICs received only one distribution in 2017 from which the Debtor received approximately $10,000.

played or could have played a significant role in the Property's daily functioning such that it may now alter the management of the Property to generate additional income.

Most importantly, the Noteholder asserts that any plan the Debtor proposes would potentially affect the rights of the Debtor's fellow interest holders without them being a party to the bankruptcy case. The relevant part of the TIC Agreement states,

> All decisions made by the Tenants with respect to the Property regarding any sale, lease, or re-lease of a portion or all of the Property, any negotiation or renegotiation of indebtedness secured by a blanket lien, the hiring of any manager, or the negotiation of any management contract (or any extension or renewal of such contract) must be by unanimous approval of all Tenants. . . . In the event the Tenants' agreement with the Management Company is terminated for any reason, the Tenants shall unanimously select a replacement to act in its stead on the same terms as the Management Company previously acted. . . . All decisions made by the Tenants with respect to the Property, other than those requiring unanimous approval as specified . . . shall be approved by Tenants holding Tenancy Percentage Interests greater than 50.0000% in the aggregate . . . provided that the Majority Approval shall include [Fairfield TIC's] approval.

(Movant's Ex. 1, ECF No. 51 at 3–4.) While the non-Debtor TICs could potentially vote to implement changes set out in any plan of reorganization, they have not appeared in this case or filed their own bankruptcy cases.[5] As a result, any plan the Court approves would alter the rights of individuals not subject to the Court's jurisdiction. For example, the Debtor suggests that part of its confirmable plan would provide for the sale of a parcel of the property to Nikki Providence Road. Such action under the TIC Agreement, however, would require consent of all the TICs, including the non-Debtor TICs. Any plan providing for such a sale would thus affect the ownership rights of the non-Debtor TICs who are not parties to this case.

Most of the Debtor's response to the Noteholder's motion attempts to refute the assertion that the Debtor cannot reorganize based merely on the structure of the investment and the TIC Agreement. In doing so, however, the Debtor appears simply to deflect from its inability to

---

[5] Mr. Wheeler controls BCP and he testified it would align with the Debtor.

9

reorganize by alleging that its fellow TIC, GCK, and the Noteholder previously violated the TIC Agreement by executing a Deed in Lieu of Foreclosure. The Debtor neither provides any theory by which this alleged breach should allow it to remain in bankruptcy, nor cites to any authority supporting its ability to coerce its fellow TICs into action by filing a plan of reorganization in Chapter 11.

The Debtor does, however, refer to several cases to illustrate that other courts have allowed similar debtors to proceed through plan confirmation. *See In re Orchards Village Invs., LLC*, 405 B.R. 341 (Bankr. D. Or. 2009); *In re Southfield Office Bldg. 14, LP*, No. 09-30893 (D. Del.).[6] *Southfield* provides the most support to the Debtor's argument. From a review of the docket in that case, however, it is apparent the court never faced a motion to dismiss pursuant to Section 1112(b). Thus, the fact that the court in *Southfield* allowed the case to proceed to plan confirmation does not mean that the court would not have dismissed the case for cause had such a motion been filed. Nonetheless, the court's ultimate confirmation of a plan of reorganization does support, if minimally, the Debtor's ability to propose a confirmable plan in this situation.

Similarly, although the court in *Orchards Village* ultimately confirmed a Chapter 11 plan, that case contains some relevant factual distinctions. 405 B.R. 341 (Bankr. D. Or. 2009). For example, the debtor in *Orchards Village* purchased land under a similar TIC agreement, but undertook construction of the property at issue, thus establishing that the debtor was not merely a "passive investor." *Id.* at 343–44. Additionally, while the court declined to dismiss pursuant to Section 1112(b), it did so because the movant failed to identify any specific cause enumerated in Section 1112(b)(4). *Id.* at 351. Unlike the court in *Orchards Village*, the Fourth Circuit has

---

[6] Because the Debtor cited *Southfield* generally by the case number and did not cite to a specific order or opinion, the citation here is to the record in that case generally.

10

recognized that "cause" to dismiss under Section 1112(b) may include general bad faith. *Carolin Corp.*, 886 F.2d at 700.

The Debtor also points the Court to cases that are ultimately dismissed or in which relief from stay is granted, noting that such action is taken after the debtors have engaged in some level of reorganization. Of those cases, the Court finds *In re Geneva ANHX IV LLC*, 496 B.R. 888 (Bankr. C.D. Ill. 2013), particularly persuasive, but in support of the Noteholder's argument. In that case, the court granted relief from the automatic stay after grappling with the issue of whether a debtor could use "substantive consolidation" to force fellow TIC LLCs in a Section 1031 investment to go along with a plan of reorganization. The court in *Geneva* recognized the value of such action in certain cases where multiple debtors sought to merge creditor's claims. In cases like *Geneva*, however, a debtor seeking "to force an unwilling non-debtor entity to merge its assets into a bankruptcy estate is especially problematic." *Id.* at 900. The court thus held that "the proposed use of substantive consolidation as a sword against the nondebtor TIC owners is improper and impermissible." *Id.* at 901.

By outlining a plan that would bind the non-Debtor TICs to a restructured loan with the Noteholder, a sale of property to Nikki Providence Road, and a payment plan to unsecured creditors, the Debtor effectively seeks to pool the interests of all the TICs to satisfy its own Chapter 11 reorganization. Similarly, the Debtor has filed a separate motion to appoint a new management company which, if granted, would effectively nullify the TIC Agreement and allow the Debtor to make management changes unilaterally in contradiction of the TICs' intentions. (*See* Mot. to Authorize Debtor to Enter Mgmt. Agreement, ECF No. 9.)

As alternatives to the Debtor commandeering the non-Debtor TICs' interests, the Debtor suggests that refinancing or sale options exist that would provide the TICs an ability to

11

reorganize collectively, and that the remaining TICs have expressed a willingness to explore those options. The Bankruptcy Court for the Western District of Virginia faced a similar situation in *In re AMA Corp.*, but used those similar facts in support of its finding of objective futility. 175 B.R. 894, 898–99 (Bankr. W.D. Va. 1995). There, despite extensions provided by the lender, the debtor could not find any willing commercial lenders to refinance, and could not develop any realistic business plan. The court stated, "The length of time it took . . . to produce a business plan, which is still incomplete, and the lack of any concrete proposal for reorganization after over a year of opportunity prepetition indicate that it is more likely than not that the Debtor will be unable to effectuate a plan." *Id.* at 899.

Although the Noteholder here did not grant the Debtor any extensions, it noted that over a year had elapsed between the Debtor's default and the filing of the bankruptcy case. Mr. Wheeler testified that in that time, he sought lenders willing to refinance the debt and potential buyers for the Property. His own investment company even made an offer to the Noteholder, albeit for the amount of $21.8 million—far below the amount still owing on the TICs' debt. None of the Debtor's efforts over the last year have resulted in any clear path toward an agreeable reorganization. The Court agrees with the court in *AMA Corp.* and does not believe that the additional time provided by a single-asset Chapter 11 case will yield different results.

The Debtor further asserts that a finding of objective futility in this case would mean that no group using this type of TIC investment structure could successfully reorganize. Instead, the Debtor suggests that reorganization is appropriate in cases such as this where one TIC files bankruptcy believing it can garner others' unanimous consent. In support of its position, Mr. Wheeler testified that he has spoken to representatives of the non-Debtor TICs and that he is

12

confident they will either join the bankruptcy or consent to any plan of reorganization so that the Court does not order any action that falls outside the scope of the TIC Agreement.

Again, the Court disagrees. According to testimony, the four TICs had numerous discussions about filing bankruptcy after the Noteholder first scheduled a foreclosure sale in July 2018. When the Debtor filed bankruptcy in October 2018, it did so without the other TICs, one of which had entered a Deed in Lieu of Foreclosure Agreement with the Noteholder. The Debtor argues that the absence of any TICs supporting the Noteholder supports the Debtor's contention that it can drum up unanimous support. The Court believes the lack of support weighs not against the Noteholder in this case, but against the Debtor. The Debtor had ample time to convince the non-Debtor TICs to join it in bankruptcy, yet the Debtor filed its petition individually. No representatives of the non-Debtor TICs other than Mr. Wheeler, who appeared on behalf of both the Debtor and BCP, filed an appearance in this case or voiced their support of the bankruptcy at trial.[7] The Debtor's efforts appear to be more in line with "approve our strategy going forward, and we will get the other TICs on board later." The Court will not sanction this approach.

The *Geneva* court noted that

> nondebtor TIC owners are entitled to the same protection of their interests they would have under state law if no bankruptcy had ensued. The Debtors point to no Bankruptcy Code provision that would give them the power to modify the rights of those nondebtors. . . . These bankruptcy filings do not empower the Debtors to eliminate or alter the rights of the non-debtor TIC owners in the manner they propose.

*In re Geneva ANHX IV LLC*, 496 B.R. at 902. The same is true here. Coupled with the fact that the Debtor has no current income and does not engage in any business conduct outside its

---

[7] The Court recognizes that Mr. Wheeler is the controlling member of both the Debtor and BCP and offered his support of the Debtor on behalf of BCP. Nonetheless, the Debtor still lacks the unanimous consent required for action under the TIC Agreement.

13

existence as a passive investment vehicle, there is no realistic possibility of reorganization. Accordingly, the Court finds that the Debtor's case is objectively futile.

### B. Subjective Bad Faith

Although courts have enumerated factors to consider when reviewing a case for subjective bad faith, "there is no 'single factor that will necessarily lead to a finding of bad faith.'" *Carolin*, 86 F.2d at 701 (quoting *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987)). Courts should not look to these enumerated factors alone, but should review the facts to determine whether the "totality of the circumstances" indicates bad faith. *Id.* For example, bad faith exists "if the purpose of a Chapter 11 debtor is to hold a single asset 'hostage' in order to speculate that such asset may increase in value [leading] to recover[y of the] original investment at the creditor's risk." *Id.* at 705 (quoting *In re Am. Prop. Corp.*, 44 B.R. 180, 182 (Bankr. M.D. Fla. 1988)) (alterations in original).

*Kinard* provides a thorough list of factors to guide courts through a subjective bad faith analysis. Among the factors considered are whether the debtor has only one asset that is encumbered by secured creditors' liens, whether the debtor has employees or any ongoing business activity to protect, the amount of the debtor's cash flow and income available to fund reorganization or offer adequate protection, the number and extent of unsecured creditors' claims, allegations of wrongdoing by the debtor, the timing of the bankruptcy filing, whether the reorganization is essentially a two-party dispute, and whether the debtor has exhausted other remedies such that bankruptcy is "the only possibility of forestalling loss of the property." 2001 WL 1806039, at *6–7 (quoting *In re Dunes Hotel Assoc.*, 188 B.R. 162, 171 (Bankr. D.S.C. 1995)).

As discussed above, the Debtor here has only one asset, which is fully encumbered by the Noteholder's claim, and no regular income or ongoing business. The parties also stipulated that the Debtor has no employees to protect. (Joint Stipulation, ECF No. 75, at 2.) According to the Debtor's schedules, only a few unsecured creditors may have claims, and none approaching the obligation owed to the Noteholder—the two largest potential claims are held by Nikki Providence Road in the amount of $750,000, and property management fees owed to Wheeler Real Estate in the amount of $268,499.70. (Debtor's Form 204, ECF No. 3.) In response to the lack of significant unsecured claims, the Noteholder has suggested that any plan of reorganization would essentially involve a two-party dispute.

The Debtor argues that the Noteholder mischaracterizes this as a two-party dispute given Nikki Providence Road's claim. Courts have dismissed similar cases, however, as the factor to be considered is not whether the case involves a two-party dispute, but whether the lack of *significant* unsecured creditors *resembles* a two-party dispute. For example, in *Little Creek*, the court noted that "[t]ypically, there are only a few, if any, unsecured creditors whose claims are relatively small." *Little Creek*, 779 F.2d at 1073. Nikki Providence's claim of approximately $750,000 is relatively insignificant when considering that the Noteholder's claim amounts to approximately $30 million and fully encumbers the Debtor's 66% interest in the property.[8]

The timing of the Debtor's filing also indicates bad faith. The Debtor filed less than a week before the scheduled foreclosure sale and after failing to stop the receivership action and foreclosure in state court. The Debtor asserts that it communicated with the Noteholder and other parties about its intent to file bankruptcy and that this factor should weigh in its favor. The

---

[8] The Court has reviewed Debtor's Exhibit G, emails and attachments between counsel for the Noteholder and counsel for Nikki Providence Road, subject to the Noteholder's objection at trial as to relevance. While Exhibit G adds little to the substantive merits of the matters being decided, the Court will overrule the Noteholder's objection and admit the exhibit.

Court recognizes that bankruptcy is often used to forestall impending foreclosure actions and that alone is insufficient to find bad faith. However, the filing occurred after the Debtor failed to succeed in its receivership action. It had no control of the Property or any of the proceeds from the Property, and the only method by which to stop the immediate foreclosure was to file bankruptcy. Thus, the timing indicates an intent to delay the Noteholder's attempt to enforce its rights.

That the remaining *Kinard* factors are absent here is of no consequence. Often debtors engage in egregious conduct providing overwhelming evidence of subjective bad faith. Courts have identified specific examples of this, including "'new debtor's syndrome' in which a one asset entity is created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors," *In re Dunes Hotel Assocs.*, 188 B.R. 162, 171 (Bankr. D.S.C. 1995), or some other alleged wrongdoing. But, although the term "subjective bad faith" indicates some level of wrongdoing, the standard is not necessarily a finding of ill will, but merely of a lack of good faith in filing. *Carolin*, 886 F.2d at 698. Although there is no evidence of egregious wrongdoing here, the Court finds that the totality of circumstances in this case demonstrates a lack of good faith on behalf of the Debtor.

In addition to the enumerated factors above, the Debtor recognized that it could not act on behalf of the non-Debtor TICs. The controlling interest holder in the Debtor, Mr. Wheeler, acknowledged in his testimony that the TIC Agreement prevents all but unanimous action to sell the Property or change management, yet further acknowledged that one or both of those actions are likely necessary as this case proceeds through Chapter 11. Such a situation evidences not only objective futility, but also an intent to disregard the rights of the non-Debtor TICs and an effort to avoid losing its only asset to the Noteholder. Knowing that the remaining TICs (with

the possible exception of Wheeler-controlled BCP) did not intend to file bankruptcy and had not consented to the Debtor's filing, the Debtor nonetheless filed its petition to prevent the Noteholder from foreclosing on its sole asset— its fractional interest in the Property. Without the consent of the remaining TICs, the Debtor knew it could not take any action to sell the property or change its management and, therefore, could not reorganize. Rather, it sought to hold its single asset "hostage," in "a bad faith effort to use bankruptcy protections for risk-free speculation in the single asset." *Id.* at 705. Accordingly, the Court finds that the Debtor filed with subjective bad faith sufficient to warrant dismissal or conversion under the *Carolin* test.

The Court further finds that it is in the best interest of the creditors to dismiss, rather than convert this case.[9] The Debtor has only one asset which is fully encumbered by the Noteholder's lien. Considering there is no equity in the Property, no other creditor would receive distributions from liquidation under Chapter 7.

## CONCLUSION

Based on the lack of assets, equity and cash flow, and considering the structure of this particular investment, the Debtor cannot propose an objectively reasonable plan of reorganization as a sole participant in the bankruptcy case. Because the owners of the Shopping Center wanted the tax benefit of like-kind exchanges, they associated as tenants in common. As the Court in *Geneva ANHX IV* observed, "a tenancy-in-common is an inflexible form of ownership." *In re Geneva ANHX IV LLC*, 496 B.R. at 904. Moreover, although the Court does

---

[9] Because the Court finds that dismissal is proper under Section 1112(b), it will not provide an in-depth analysis of the Noteholder's request for relief from stay pursuant to Section 362(d). Nonetheless, the Court believes the Noteholder meets the standard for relief under Section 362(d)(1) for cause, as the Debtor cannot provide adequate protection and filed in bad faith. Moreover, the Court could grant relief under Section 362(d)(2), as the Debtor has no equity in the Property and, as discussed above, no effective reorganization is possible. *See In re Geneva ANHX IV LLC*, 496 B.R. at 899 (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988)) (recognizing that "necessary to an effective reorganization" does not require merely a showing that the property is necessary for any possible reorganization, but that "there must be 'a reasonable possibility of a successful reorganization within a reasonable time'").

17

not believe the Debtor filed its bankruptcy case with malice—that is not the standard set forth by the Fourth Circuit. Rather, the Debtor did not file in good faith because it did so to delay its largest secured creditor when its controlling member knew there was no reasonable possibility of reorganization. Accordingly, the Noteholder has carried its burden to show that the Debtor has met both the objective and subjective prongs of the *Carolin* test such that this case will be dismissed pursuant to 11 U.S.C. § 1112(b) for cause.

A separate Order will be entered contemporaneously herewith.

Decided this 29th day of November, 2018.

_____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: December 4, 2018